# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.                                                    CRIMINAL NO.: 2:09CR109

JOSUE VALLE-TELLEZ

## ORDER ON MOTION TO SUPPRESS

The Defendants filed motions to suppress statements made and evidence seized from a traffic stop instituted on a white Pontiac Grand Prix on July 17, 2009. A hearing was held on November 24, 2009. The Court makes the following findings:

*Factual and Procedural Background*

On July 17, 2009, Southaven Police officer, Sgt. Lance Sheppard, was running stationary patrol south of Church Road on Interstate 55 with another officer, Cunningham. At 1:40 a.m., Sgt. Sheppard observed a white Pontiac Grand Prix traveling north on Interstate 55 with no license plate tag. Sheppard activated his blue lights and pulled the vehicle over approximately two miles from his patrol spot. The officer testified that upon pulling the car over, he noticed that the vehicle did in fact have a tag, however, the tag light was not operational. Prior to approaching the stopped vehicle, Sgt. Sheppard activated his personal Sony digital voice recorder that he kept in his vest pocket.

Sheppard made a passenger-side approach to the vehicle and asked the driver for his license and insurance. Once produced, Sheppard asked the driver, Josue Valle-Tellez to exit the vehicle. Sheppard testified that there were three occupants in the vehicle. Officer Cunningham arrived and secured the passengers while Sheppard took Valle-Tellez behind the vehicle to question him. Sheppard immediately informed Valle-Tellez that he was stopped because the tag light on the back

of the vehicle was out. The officer frisked Valle-Tellez to make sure he was not carrying any weapons and asked the driver about his travel plans. Valle-Tellez told Sheppard that the group had been in Houston, Texas, for half a day looking for houses and were now headed back to Michigan. The driver identified the front seat passenger as his cousin, "Caesar" or "Cabezas," but was unable to tell the officer his cousin's real name. Moreover, he identified the back seat passenger as his girlfriend of two months, Wanda. Sheppard again stated that he pulled the vehicle over because of the malfunctioning tag light. The driver acknowledged the light was non-functioning and explained that he did not realize the light was out. Sheppard asked Valle-Tellez to stand by the other officer, Cunningham, while he questioned the passengers. Sheppard asked for and received identifications for both which proved the cousin to be Elias Salgado Hernandez, and the girlfriend to be Rhonda Jean Milsap.

When asked about the group's travel plans, Hernandez stated that they had been in Houston for a day and were headed back to Michigan. Rhonda Milsap also answered that they had been in Houston and were heading back to Michigan. While Sheppard was questioning the occupants of the vehicle, the computer check of the Grand Prix's license plate came back. The vehicle was registered to a party not in the car but had not been reported stolen.

Eleven minutes into the traffic stop, Sgt. Sheppard asked Valle-Tellez, the driver, if he could search the vehicle. Valle-Tellez answered "Sure." Sheppard asked again if he could search inside the vehicle, and Valle-Tellez responded affirmatively twice. Sheppard and Cunningham testified at the hearing that aside from the three verbal assurances that the officer could search the vehicle, Valle-Tellez also gestured toward the car in assent to the request to search. During this exchange, Sgt. Sheppard maintained control over Valle-Tellez's license and proof of insurance, and Hernandez

and Milsap's identifications.

As a result of the search, Sgt. Sheppard uncovered approximately eight kilograms of heroin hydrochloride concealed in the bumper of the vehicle. Defendants seek to suppress the evidence obtained as a result of the search alleging that the seizure was unreasonable and the search of the vehicle was illegally conducted.

*Discussion and Analysis*

The Fourth Amendment protects against illegal searches and seizures. U.S. CONST. AMEND. IV. The United States Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (footnote omitted); United States v. Wallen, 388 F.3d 161, 164 (5th Cir. 2004) (warrantless searches are presumptively unreasonable). When a warrantless search or seizure is challenged, the government bears the burden of establishing its validity by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) (the burden of proof at a suppression hearing should be no greater than proof by a preponderance of the evidence).

*I. Initial Stop*

Courts evaluate the legality of traffic stops under the Terry v. Ohio framework. United States v. Jenson, 462 F.3d 399, 403 (5th Cir. 2006) (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). In determining whether a seizure exceeded the scope of a permissible Terry stop, courts undertake a dual inquiry: (1) whether the officer's action was justified at its inception; and (2) whether it was reasonably related in scope to the circumstances that justified the interference

3

in the first place. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).

The Defendants do not dispute that Sgt. Sheppard was justified in stopping the vehicle for an improper tag light. Thus, the first prong is satisfied.

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." Brigham, 382 F.3d at 507. Whether a court will sanction an officer's intrusion on a detained motorist's right to be free from an unreasonable search or seizure is based on the "reasonableness" of the detention. See Ohio v. Robinette, 519 U.S. 33, 40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (directing that the "touchstone of Fourth Amendment analysis is reasonableness") (quoting Florida v. Jimeno, 500 U.S. 248, 250, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)). This "requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." Brigham, 382 F.3d at 507. "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." Robinette, 519 U.S. at 39, 117 S. Ct. 417. One of the factors used to make that determination is whether the investigative methods employed are "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); see also United States v. Valadez, 267 F.3d 395, 398 (5th Cir. 2001); United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1993).

In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Brigham, 382 at 507-08. Computerized license and

registration checks are an "efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means." Brigham, 382 F.3d at 511. "Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop." Id. An officer may ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "detention, not questioning, is the evil at which Terry's second prong is aimed." Id. (quoting United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993)).

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510; see also United States v. Santiago, 310 F.3d 336, 341-42 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); Dortch, 199 F.3d at 200. "[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." Royer, 460 U.S. at 503, 103 S. Ct. 1319. Indeed, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." United States v. Place, 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). The United States Supreme Court has noted that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable , common sense and ordinary human experience must govern over rigid criteria." United States v. Sharpe, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). The Court further held,

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

Id. at 686, 105 S. Ct. 1568.

Sheppard testified that about forty to forty-five minutes elapsed from the beginning of the detention until the narcotics were found. The Court has extensively reviewed the audio and finds the time line of events helpful for determining whether Sgt. Sheppard diligently pursued the investigation of the tag light infraction.

The facts and testimony from the hearing prove that after Valle-Tellez exited the vehicle, Sheppard informed him of the reason for the stop. The officer maintained possession of Valle-Tellez's drivers license throughout the entire encounter. Sheppard then showed Valle-Tellez that the tag light was out about three minutes into the stop. After questioning the group about their travel plans, Sheppard again informed the driver that he had been pulled over for a tag light infraction. Valle-Tellez's license had not been run through the computer check at that time. Hernandez and Milsap's licenses were procured by the officer over six minutes into the encounter. Sheppard then returned to question Valle-Tellez, who was being watched by Officer Cunningham during Sheppard's interrogation of the passengers. Ten minutes into the encounter, Sheppard still had not instituted a computer check of the licenses. Sheppard testified that the licenses were finally radioed in and came up clear after the voice recording was ended, twelve minutes after the Pontiac was pulled over.

While the Court is unwilling to determine whether the length of time the Defendants were detained is unreasonable, the record is clear that the officers did not diligently pursue the

6

investigation of the tag light infraction. After alerting the driver of the vehicle of the infraction, showing the non-operational light and reasserting the reason for pulling the vehicle over, the officer could have radioed in the license and issued the citation. However, in this case, the officer prolonged the stop by waiting to run the computer check until after consent to search the vehicle was given by the Defendants.

The Supreme Court has held that a delay in detention caused by the defendants is not unreasonable because absent the defendants' actions "only a short and certainly permissible pre-arrest detention would likely have taken place." Sharpe, 470 U.S. at 686, 105 S. Ct. 1568. Here, the Defendants fully cooperated in answering Sheppard's questions, provided documentation, and followed orders. The delay in this instance was caused by the investigatory tactics on the part of the officers.

If additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003). In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27, 88 S. Ct. 1868. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). When making a reasonable suspicion determination, the Fifth Circuit has said repeatedly that courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. Id. at 273, 122 S. Ct. 744 (citing United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1975)); Grant, 349 F.3d at 197. This

7

allows officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273, 122 S. Ct. 744.

The Government argues that reasonable suspicion of drug trafficking arose during the course of the stop to justify the officer's delay in running the drivers' licenses. Indeed, Sgt. Sheppard testified that within five minutes of talking with Josue Valle-Tellez, he became suspicious. In particular, Sheppard noted that the group's travel plans did not make sense to him. He contends that Valle-Tellez stated they were in Houston half a day, but Hernandez said a day, and Milsap said two days. Sheppard additionally noted the fact that Valle-Tellez did not know his cousin's full name and stated his girlfriend of two month's name wrong. Based on those inconsistencies, Sgt. Sheppard testified that he developed a suspicion that the occupants of the Grand Prix were involved in drug trafficking.

The Fifth Circuit has addressed a similar situation to the case at hand. In Dortch, a driver and passenger traveling in a rental car were stopped by police for driving too close to a tractor trailer. 199 F.3d at 195. The rental papers indicated that neither the driver or the passenger rented the car or were authorized drivers. Id. at 195-96. During the stop, the officer asked questions of the driver and passenger independently of each other. The driver and passenger gave inconsistent answers about the driver's relationship with the person who rented the car. Id. at 196. Moreover, the driver stated that he had been in Houston the past two days, although the rental papers indicated the car had been rented the day before in Pensacola, Florida. Id.

The Fifth Circuit held that "there was no reasonable or articulable suspicion that Dortch was trafficking in drugs." Id. at 199. In fact, "[t]he answers [Dortch] and his passenger gave, even

8

assuming they were suspicious, did not give rise to that inference." Id. The Court went on to state:

> Rather, the confusion as to the relationship of Dortch to the proper renter of the vehicle, combined with Dortch's absence as an authorized driver on the rental agreement and the allegedly inconsistent answer about the stay in Houston, gave rise only to a reasonable suspicion that the car might have been stolen.

Id. Likewise, in Jones, the Fifth Circuit held there was no reasonable suspicion of drug trafficking even though one of the occupants had a previous arrest on a crack cocaine charge. 234 F.3d at 242. The defendants in Jones also gave inconsistent answers about the driver's employment - the driver said he worked with his uncle, while the uncle said he was self-employed. Id. In another case, where the defendant lied to the officer about the identity of the passenger, exhibited nervousness, and made conflicting statements about his relationship with the owner of the vehicle, the Fifth Circuit held there was no reasonable suspicion of drug trafficking to further detain the driver after the computer check came back clear. Santiago, 310 F.3d at 341-42.

The Government has not presented adequate evidence of a nexus between the Grand Prix occupant's allegedly suspicious behavior and any specific criminal activity. The inconsistent answers about travel plans and confusion over the relationships of the occupants of the vehicle do not lend themselves to a reasonable suspicion of drug trafficking. Sgt. Sheppard did not articulate any particular connection between the allegedly suspicious behavior and drug trafficking.

*II. Search of the Vehicle*

The Government contends that Valle-Tellez's consent to a vehicle search cured the Fourth Amendment violation. A search pursuant to consent is a well-settled exception to the Fourth Amendment's warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). "Consent to search may, but does not necessarily, dissipate the taint of a

9

fourth amendment violation." United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993). To determine whether consent was validly given, the Court ask (1) whether consent was voluntary and (2) whether it was an independent act of free will. See Santiago, 310 F.3d at 342 (citing Chavez-Villarreal, 3 F.3d at 127).

The Fifth Circuit uses a multi-factor test to determine whether consent was voluntary, in which the following are considered:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

Jones, 234 F.3d at 242 (citing Shabazz, 993 F.2d at 438). The government bears the burden of proving that consent was voluntary. See id.

To determine whether consent was independent, the Court considers "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." Jones, 234 F.3d at 243. Though the initial officer misconduct was not flagrant, the first two factors cut decidedly against the government.

During the encounter, the occupants at all times were supervised. The testimony at the hearing was that when Sgt. Sheppard was with the driver behind the car, Officer Cunningham was supervising the passengers. Likewise, when Sgt. Sheppard removed Hernandez from the passenger seat to speak with him on the side of the road, the driver was attended to by Officer Cunningham. Josue Valle-Tellez cooperated fully with Sgt. Sheppard throughout the encounter. On the recording, Valle-Tellez seemed to speak and understand English very well. Valle-Tellez testified at the hearing that he was not aware during the prolonged encounter that he was free to go at any time. Sgt.

10

Sheppard testified that the citation was not actually written and served to the driver until two hours after the drugs were found in the bumper. Thus, the consent was given prior to receiving a warning or ticket. Moreover, Sgt. Sheppard retained Valle-Tellez's and the passengers' licenses. These identification cards had not been returned to the occupants of the Grand Prix before consent was requested and given.

The consent followed closely on the heels of the illegal detention, and there is no evidence that (a) Valle-Tellez knew he was free to leave or (b) that his license had been returned to him, both of which might be viewed as intervening circumstances. See Jenson, 462 F.3d at 407. In Jones, the Fifth Circuit found the causal chain had not been broken where the officers "appeared to knowingly prolong the detention" by purposely failing to return one of the passenger's identification cards. 234 F.3d at 243.

After reviewing all the attendant circumstances and arguments, the Court is of the opinion that the consent was not an independent act of Valle-Tellez's free will. See Chavez-Villarreal, 3 F.3d at 128 (holding defendant's consent was not an independent act of free will because officers retained his alien registration cards); Dortch, 199 F.3d at 202 (defendant's consent to search was not an independent act of free will where officers held license and rental papers and did not inform the defendant that he could refuse consent).

*Conclusion*

Because the narcotics were found during an illegally extended traffic stop, the evidence must be suppressed. "Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the

Fourth Amendment violation." United States v. Portillo-Aguirre, 311 F.3d 647, 658 (5th Cir. 2002). The Fifth Circuit has consistently relied on this doctrine to suppress evidence found during illegally extended traffic stops. See Jenson, 462 F.3d at 408 (holding that where "[t]he police would not have discovered [the evidence] but for the search of his person, and the police would not have searched his person had they not illegally extended the stop beyond the time when reasonable suspicion expired," the evidence had to be suppressed under the fruit of the poisonous tree doctrine); Jones, 234 F.3d at 243-44; Dortch, 199 F.3d at 200-01.

Here, the narcotics were the "fruit" of the detention: as in Jenson, Sgt. Sheppard would not have discovered the narcotics but for the fact that Sheppard continued the stop. Moreover, there is nothing in the record or in the Government's briefs to suggest that there was an intervening circumstance that might have broken the chain of causation and attenuated the connection between the allegedly illegal seizure and the discovery of the narcotics, such as an independent and voluntary consent.

In sum, Sheppard did not find the narcotics while effectuating the initial purposes of the stop or while addressing reasonable suspicion developed during the course of the stop. Sgt. Sheppard was aware only of facts sufficient to support a hunch that Valle-Tellez was hiding something, rather than particularized reasonable suspicion of criminal wrongdoing. Thus, the stop was unreasonably extended, and the narcotics must be suppressed as the fruit of an illegally extended traffic stop.

Defendants' Motions to Suppress are GRANTED.

SO ORDERED, this the  18th  day of December, 2009.

                                             **/s/ Sharion Aycock**
                                             **U.S. DISTRICT JUDGE**